JS - 6

O

1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                          CENTRAL DISTRICT OF CALIFORNIA
10                               WESTERN DIVISION
11
12   MARILYN McILHANEY,                 )   Case No.  CV 09-3887 CAS (PJWx)
                                        )
13                  Plaintiff(s),       )
                                        )
14   vs.                                )   **FINDINGS   OF   FACT   AND**
                                        )   **CONCLUSIONS OF LAW**
15   ANTHEM   LIFE   INSURANCE          )
     COMPANY LONG TERM DISABILITY       )
16   PLAN;  ANTHEM  LIFE  INSURANCE     )
     COMPANY LIFE INSURANCE PLAN,       )
17   ANTHEM   LIFE   INSURANCE          )
     COMPANY IN ITS CAPACITY OF         )
18   ADMINISTRATOR OF THE ANTHEM        )
     LIFE INSURANCE COMPANY LONG        )
19   TERM DISABILITY PLAN,              )
                                        )
20                  Defendant(s).       )
     _____)
21
22                              **INTRODUCTION**
23          This matter came on for trial to the Court on June 11, 2010.  Tracy Collins, of the
24   Law Offices of Tracy Collins appeared for plaintiff Marilyn McIlhaney, and Brian M.
25   Stolzenbach of Seyfarth Shaw LLP appeared for defendants Anthem Life Insurance
26   Company Long Term Disability Plan, Anthem Life Insurance Company Life Insurance
27   Plan, Anthem Life Insurance Company, in its capacity of Administrator of the Anthem
28   Life Insurance Company Long Term Disability Plan.

This case involves two separate claims under the Employee Retirement Income Security Act, 29 U.S.C. 1001, et seq. ("ERISA").  The first is a claim for benefits under an ERISA plan pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). The second is a claim for monetary penalties under Section 502(c)(1) of ERISA, 29 U.S.C. § 1132(c)(1), for an alleged failure to provide plan documents to a plan participant as required by the statute.

Plaintiff seeks recovery of long term disability benefits and continued life coverage under waiver of the premium under ERISA-governed, self-funded employee benefit plan sponsored by Anthem Insurance Companies, Inc.  Although plaintiff was approved for short term disability work after she left work on September 28, 2007, she was denied long term disability benefits.

At issue are four plan documents, a certificate for LTD benefits (AR 1-35), a certificate for life coverage (AR 36-58), a Summary Plan Description ("SPD") for STD (AR 769-782) and an SPD for the Wellpoint Flexible Benefits Plan, which incorporates LTD and life benefits, but not STD (AR 448-480).

## FINDINGS OF FACT

I.   <u>**Plaintiff Marilyn McIlhaney and the WellPoint Flexible Benefits Plan.**</u>

1.     Plaintiff Marilyn McIlhaney was employed by WellPoint as a Senior Project Manager and, as a result of that employment, was a participant in the WellPoint Flexible Benefits Plan ("the Plan").[1]  (AR 207.)

2.     The Plan provides various benefits through various component Benefit Programs, including, among several others, a Long Term Disability (LTD) Benefit

---

[1]Although the Complaint alleges two separate benefit plans called the "Anthem Life Insurance Company Life Insurance Plan" and the "Anthem Life Insurance Company Long Term Disability Play," the parties have stipulated that there is but one single benefit plan at issue and that its correct name is the "WellPoint Flexible Benefits Plan."  (Dkt. Entry No. 25.).

Program ("the LTD Program") and an Associate Group Life, Accidental Death/Disability Benefit, and Dependent Life Program ("the Life Program").  (AR 453.) This lawsuit involves claims by plaintiff for LTD benefits and life insurance benefits under the Plan; therefore, only the LTD and Life Programs are relevant to the case.

3.      The terms of the LTD and Life Programs are described in separate documents, which (along with descriptions of the various other component benefit programs) are incorporated into the overarching plan document by reference.  (AR 453 ["Each of the component Benefit Programs . . . is described in its summary plan description.  The summary plan descriptions for the Benefit Programs are incorporated into this Plan and are available on the HR intranet site."]; AR 1-35 [LTD Program summary plan description]; AR 36-58 [Life Program summary plan description].)

4.      The LTD Program provides for disability payments to eligible participants beginning only after the individual has been continuously disabled for an "elimination period" of 180 days.  (AR 4, 17.)

5.      The LTD Program requires a claimant to submit "objective" medical evidence of the cause of her disability and initially defines "disability" as follows: "You are not able to perform some or all of the material and substantial duties of you[r] regular occupation, and you have at least a 20% loss in your pre-disability earnings." (AR 16, 29.)  That is, at the outset of the LTD period, the individual need be disabled only from her own occupation to qualify for LTD benefits.

6.      The LTD Program further states that the Plan "will continue payment to you beyond 24 months if due to the same sickness or injury . . . [y]ou are not able to perform the material and substantial duties of any gainful occupation. . . .  OR . . . while you are not able to perform some or all of the material and substantial duties of your regular occupation, you are working in any occupation and have at least a 20% loss in your pre-disability earnings."  (AR 16, 29.)  In other words, after the first two years, the individual generally must be disabled from all occupations to continue receiving LTD benefits.

7.      In addition, the LTD Program does not pay benefits after 24 months in cases of disability "due to mental illness, substance abuse, or self-reported symptoms." (AR 25.)  The Plan states that "[e]xamples of self-reported symptoms include, but are not limited to headaches, pain, [and] fatigue."  (AR 26.)

8.      The Life Program contains a "waiver of premium" provision that allows a person who is "totally disabled" to continue life insurance coverage under Plan without paying premiums.  (AR 46.)  A "total disability" for this purpose is defined by the Plan as a "condition which, as certified by a physician . . . is due to an illness or injury [that] prevents the [individual] from performing the material and substantial duties of any occupation for wage or profit."  (AR 46.)

9.      Unlike disability benefits under the LTD Program, the waiver of premium provision is not capped at two years for mental illnesses or self-reported symptoms. (AR 36-58.)

**II.     The Plan Administrator.**

10.     Anthem Insurance Companies, Inc. is the Plan Sponsor and Plan Administrator, and it funds the Plan benefits relevant to this lawsuit.  (AR 454.)

11.     The Plan gives the Plan Administrator "discretionary authority to interpret the Plan in order to make eligibility and benefit determinations as it may determine in its sole discretion.  The Plan Administrator also has the discretionary authority to make factual determinations as to whether any individual is entitled to receive any benefits under the Plan."  (AR 463.)

12.     Anthem Insurance Companies, Inc. has delegated its responsibility for making benefit determinations under the LTD and Life Programs to defendant Anthem Life Insurance Company ("Anthem Life").  (AR 463, 479.)  In fact, by the express terms of the Plan, Anthem Life is designated as the "Benefit Program Plan Administrator" for those two aspects of the Plan.  (Id.)

**III.    The Short Term Disability Plan.**

13.     During her employment with WellPoint, plaintiff was also a participant in

4

the WellPoint Short Term Disability Plan ("the STD Plan"), which is completely separate from the WellPoint Flexible Benefits Plan.  (AR 448-80; AR 769-82.)

14.     The STD Plan provides disability benefits for a maximum of 180 days to participants afflicted by "a condition which renders the [participant] unable to perform substantially all of the normal duties of his or her job."  (AR 774, 775.)

15.     Decisions on claims for benefits under the STD Plan are made by the Leave of Absence (LOA) Team within WellPoint's Human Resources Department.  (AR 771-74, 777; see also, e.g., AR 433-34.)

**IV.     Plaintiff's Initial Absence and Her Claim for STD Benefits**.

16.     Plaintiff's last day at work was September 28, 2007, after she was diagnosed with Legionnaire's disease, a type of pneumonia (i.e., lung infection) caused by Legionella bacteria.  (AR 207, 259.)

17.     Plaintiff was initially treated for her pneumonia by pulmonologist Ronald Popper, who saw her in his office on September 27, October 1, 11, and 29, and November 19, 2007.  (AR 389-90, 393-96, 407.)

18.     Based on information from plaintiff and Dr. Popper, Robin Moody of the WellPoint Human Resources Department initially approved plaintiff for disability benefits under the STD Plan from the day she had left work through November 30, 2007.  (AR 399, 410.)

19.     Because plaintiff continued to experience an unexplained low-grade fever, Dr. Popper eventually referred plaintiff to infectious disease specialist Jeffrey Galpin, who first saw her for this problem on November 30, 2007.  (AR 429.)

20.     On December 13, 2007, Moody, who was managing plaintiff's absence from an employee relations perspective as well as a benefits perspective, referred her file to Leave of Absence Clinical Consultant Lynn Vincz, R.N., to "review for [her] thoughts on the [diagnosis] of [Legionnaire's] disease so [Moody could] advise local [human resources]."  (AR 412.)

21.     On December 18, 2007, Vincz prepared a memorandum for Moody

generally discussing the nature of Legionnaire's disease and suggesting that plaintiff's STD benefits be extended from December 1, 2007, until Dr. Galpin cleared her to return to work.  (AR 418-19.)

22.    On December 27, 2007, Moody approved plaintiff for an extension of disability benefits under the STD Plan through December 28, 2007.  (AR 423.)

23.    On January 23, 2008, Dr. Galpin submitted a form in support of plaintiff's claim for a further extension of her STD benefits, and on February 21, 2008, Dr. Galpin faxed Moody a copy of his notes from plaintiff's November 30 and December 28, 2007, January 15, and February 15, 2008 office visits.  (AR 426-28, 430-31.)

24.    The documentation submitted by Dr. Galpin asserted that plaintiff had recovered from Legionnaire's disease, but reported that she was tired, weak and unable to return to work.  (AR 426-28, 430-31.)

25.    On February 22, 2008, Moody approved plaintiff for disability benefits under the STD Plan from the day she had left work until March 28, 2008-the maximum 180-day period allowable.  (AR 433-34.)

**V.    Plaintiff's Initial LTD and Waiver of Premium Claim**.

26.    From the date-stamp on the documents, it appears that Anthem Life received copies of all the foregoing letters from Moody and submissions from Dr. Popper, Dr. Galpin and plaintiff (among various other items) on February 26, 2008.

27.    The next day, Anthem Life sent plaintiff a letter informing her that she could be eligible for LTD benefits beginning on March 29, 2008, enclosing an LTD claim packet, and encouraging her to complete the forms in the packet and submit them (if she believed she would have a claim) as soon as possible.  (AR 387-88.)

28.    Plaintiff did not immediately respond to that letter, so Anthem Life informed her in another letter dated April 2, 2008, that if she did not submit the completed forms by April 14, 2008, it would assume she did not wish to pursue a claim for LTD benefits.  (AR 385-86.)

29.    Plaintiff completed the paperwork and sent it to Anthem Life by letter

dated May 14, 2008.  (AR 208.)

30.     Because plaintiff's claim for waiver of premium under the Life Program largely overlapped her LTD claim, the two claims were considered together by Anthem Life during its claim process.  (AR 61, 236.)

31.     In her initial May 14, 2008 submission, plaintiff included an "Employee's Statement" and an "Activities of Daily Living [ADL] Form."  In the "Employee's Statement," plaintiff described her alleged disability as follows:  "terrible headache, body pain, extre[me] fatigue and fever, plus concentration problems + memory problems + depression," as well as "immune system problems."  (AR 207.)  In her ADL form, plaintiff described her medical condition as "extreme fatigue, debilitating pain, memory loss, problems with concentration and continued fever."  (AR 214.)  At the same time, plaintiff noted that she had been "diagnosed with sleep apnea prior to going out on disability" with Legionnaire's disease.  (AR 215.)

32.     Plaintiff also stated in her ADL form that she was able to drive and did not usually need any assistance to travel.  (AR 214.)  She further stated that she went shopping twice a week for 1-2 hours.  (AR 216.)  In addition, she explained that she engaged in child care activities for 4-8 hours per day, including helping her daughter with homework, supervising her and transporting her.  (AR 216.)  Finally, she noted that she spent time reading magazines, books (including the Bible), and newspapers for thirty minutes to an hour per day.  (AR 216.)

33.     On May 22, 2008, Anthem Life received records from psychologist Stephen Fitch, who first began treating plaintiff on May 1, 2008, more than a month after the end of her elimination period.  (AR 364-79.)

34.     On May 27, 2008, Dr. Galpin faxed Anthem Life a Physician's Statement for specific use in processing plaintiff's claim for LTD benefits.  (AR 339-40.)  In that statement, contrary to Dr. Galpin's own notes from the previous winter (Compare AR 340 with AR 431), he asserted that plaintiff was unable to work, but he responded to a request for objective findings to support this assertion by writing "N/A" and wrote that

plaintiff had the following "subjective" symptoms: "chronic fatigue, high blood pressure, fever, Legionellosis, and [illegible]." Although Dr. Galpin had previously reported that plaintiff had recovered from Legionellosis, the record does not demonstrate that he was ever asked to explain this comment.

35.    In the same form, Dr. Galpin wrote that plaintiff continued to be able to perform "sedentary daily activities" but that she needed six to nine hours' sleep and should not be performing "any heavy, prolonged, or emotional capacity work." (AR 340.) Dr. Galpin again stated that plaintiff was unable to return to work. Id. In response to a request to identify any mental impairments afflicting plaintiff, he identified none. Id.

36.    On May 29, 2008, Anthem Life received medical records from neurologist Paul Dudley, who treated plaintiff in 2002, 2003, 2006, and early 2007 prior to plaintiff's last day at work. (AR 341-63.) Those records reflected a diagnosis of carpal tunnel syndrome and back problems, but plaintiff was able to work with these conditions, and neither plaintiff nor her doctors ever claimed to Anthem Life that these conditions were the cause of her alleged disability. (AR 341-63.)

37.    Subsequently, Anthem Life obtained an initial review and analysis of plaintiff's claim from Karen Greenleaf, R.N., who was employed by a third party, Custom Disability Solutions (CDS). (AR 326-28.) Greenleaf concluded that plaintiff did not submit any objective data to support her claim of disability. (AR 328.) In reaching this conclusion, Greenleaf noted that Dr. Galpin-an infectious disease specialist-never referred plaintiff to anyone or performed any tests to confirm any alleged limitations on her cognitive functions or memory or any other mental or psychological problems and that plaintiff did not even see anyone for a mental impairment until May 1, 2008, which was after her last day at work and the end of her elimination period. (AR 327.) Greenleaf further noted that plaintiff reported in her ADL form that she was reading, driving, watching movies and assisting her daughter with homework, all of which was inconsistent with her claims of significant memory

loss, concentration problems or cognitive deficits. (AR 327.) Greenleaf similarly noted that a claim of severe fatigue would be inconsistent with various reports of plaintiff's recent activities, and she observed that plaintiff had been able to work with her sleep apnea, plaintiff herself having stated that she was diagnosed with the disorder before she went out on disability. (AR 327.) Finally, Greenleaf noted that plaintiff had a long history of non-disabling joint and upper extremity pain, as reflected in the records of Dr. Dudley, and that there was no suggestion that these issues worsened into a disabling condition. (AR 327.)

38.     After Greenleaf's review, Anthem Life commissioned an independent medical review by two doctors associated with another third party, Behavioral Medical Interventions (BMI). (AR 244-50.) The BMI doctors who reviewed the case were Michael Silverman, a board certified internist, and John Shallcross, a licensed psychologist. (AR 250.)

39.     In a joint report dated June 30, 2008, Dr. Shallcross and Dr. Silverman concluded that the medical records submitted by plaintiff, along with an oral report provided to Dr. Shallcross by Dr. Fitch, did not include any clinical evidence to support a claim that plaintiff's physical and mental health conditions were severe enough to prevent her from working. (AR 244-50.) The doctors noted, in particular, the absence of any objective testing to verify plaintiff's own self-reports of functional impairment. (AR 244-50.)

40.     On July 1, 2008, Dr. Galpin wrote a letter to Dr. Silverman in response to certain questions Dr. Silverman had sent him. (AR 291-94.) Dr. Galpin's letter repeated the information found in Dr. Galpin's office visit notes from plaintiff's office visits (which Dr. Silverman had already seen). (Compare AR 293-94 with AR 317-18; see also AR 244.) Dr. Galpin's letter also discussed a new office visit on June 27, 2008. (AR 291-94.) Dr. Galpin identified a few medications plaintiff was taking and then asserted "[i]t is clear that [plaintiff] still has many of the findings of a myofascial pain disorder or a post-viral encephalopathy, a homeostatic abnormality in terms of stressed

systems within the limbic system of her brain that make her functionally impaired, that include, again, palpitations, marked fatigue, cognitive dysfunction, and severe aches and pains that increase with activity.  At this point, she clearly is too impaired for working as an auditor . . . ."  (AR 294.)

41.    After reviewing Dr. Galpin's July 1, 2008 letter, Dr. Silverman informed Anthem Life that the letter did not change his previous conclusion that there was no objective medical evidence to support a finding of disability.  (AR 251-52.)

42.    On August 8, 2008, Anthem Life denied plaintiff's claim for LTD benefits.  (AR 240-43.)  Relying largely on the report from Drs. Shallcross and Silverman, Anthem Life noted, among other things, that the psychotherapy notes provided by plaintiff "[did] not provide sufficient evidence of a mental/nervous condition that would preclude [plaintiff] from working."  (AR 242.)  Anthem Life also noted that there was "no objective medical evidence submitted to support [plaintiff's] memory complaints such as neuropsychological testing or even a basic assessment of [plaintiff's] memory, concentration, ability to focus, executive ability, or attention."  (AR 242.)  Similarly, Anthem Life observed that there was no documentation in plaintiff's medical records to support her claim that her pain was disabling.  (AR 242.)

43.    Anthem Life's denial letter did include one statement evincing a misinterpretation of one section in plaintiff's ADL form.  Specifically, the denial letter improperly noted that plaintiff "coached her daughter's softball and soccer teams [and] went camping."  (AR 241.)  In fact, plaintiff stated:  "Have not done much . . . camping since I don't feel good so don't participate.  Last year, I coached my daughter's softball and soccer teams.  I would have liked to do this again this year but I am unable to physically and mentally."  (AR 216.)  While this error may have been inadvertent, in the Court's view, it is an error that contributed to the conclusion that plaintiff was not entitled to LTD benefits.

44.    On September 2, 2008, Anthem Life denied plaintiff's claim for waiver of premium under the Life Program.  (AR 326-28.)  Because plaintiff was determined not

to be disabled from her own occupation for purposes of the LTD Program and the Life Program required plaintiff to be disabled from all occupations, Anthem Life simply referenced its denial on the LTD claim as the rationale for its decision.  (AR 236-38.)

**VI.    Plaintiff's Administrative Appeal**.

45.     Plaintiff retained counsel, Tracy Collins, to assist with an administrative appeal to Anthem Life of the denial of her LTD and waiver of premium claim.  (AR 62-63.) On October 6, 2008, Collins wrote to Anthem Life to announce her retention and to request, among other things, a copy of the relevant plan documents.  (AR 62-63.)

46.     On October 20, 2008, Anthem Life Appeal Coordinator Kristie Woods sent Collins a letter stating that she was enclosing the requested documentation.  (AR 61.)

47.     Collins wrote back on November 5, 2008, asserting that the LTD Program document had not been enclosed with Woods's letter and notifying Woods that the Social Security Administration (SSA) had approved plaintiff for disability benefits some time before October 25, 2008, but after Anthem Life had initially denied plaintiff's claim.  (AR 178-84.)  With her letter, Collins enclosed the SSA's Notice of Award, which set forth the amounts plaintiff would be receiving from SSA but included no discussion of the basis for its decision.  (AR 178-84.)

48.     In a February 2, 2009 letter to Woods, Collins presented plaintiff's substantive appeal, which raised three main points.  (AR 120-22.)  First, Collins noted that Dr. Galpin had not yet released plaintiff to return to work and argued that this was inconsistent with Vincz's December 18, 2007 memorandum stating that plaintiff should be approved for STD benefits until Dr. Galpin released plaintiff to return to work.  (AR 120-21.)  Second, she argued that Anthem Life should find plaintiff to be disabled because the SSA found her to be disabled.  (AR 121.)  Third, she pointed out the misreading of plaintiff's ADL form found in Anthem Life's denial letter.  (AR 121.)

49.     With her February 2, 2009 letter, Collins also submitted records from neurologist Martin Levine and rheumatologist Allan Metzger, as well as a new letter

11

from Dr. Fitch.  Dr. Levine did not see plaintiff until November 2008.  (AR 151-58.)
Plaintiff provided records from a September 2008 office visit with Dr. Metzger and
stated that she also saw him in July and November 2008.  (AR 122, 177k-p.)  As noted
previously, plaintiff did not see Dr. Fitch until May 1, 2008.  (AR 288, 366, 375-77.)
Accordingly, none of them could speak to plaintiff's condition during or at the end of
her elimination period.

50.     In the February 2, 2009 letter, Collins also repeated her assertion that she
had not been provided with the LTD Program document.  (AR 120.)

51.     On March 2, 2009, in response to this assertion, Woods sent Collins a copy
of the LTD Program document.  (AR 767-817.)

52.     Plaintiff did not present any testimony at trial on the subject of who
actually received and opened the initial October 20, 2008 letter from Woods to Collins
or otherwise addressing the question of whether the LTD Program document was
enclosed with that letter.

53.     As it did during the initial claim process, Anthem Life once again referred
the case to an independent medical review service-this time to Reliable Review Services
(RRS).  (AR 107-09.)  The file was reviewed by two doctors associated with RRS:  Dr.
Bartholomew Bono (board certified in infectious diseases) and Dr. Mark Schroeder
(board certified in psychiatry).  (AR 96-106.)

54.     According to a curriculum vitae submitted by plaintiff, Dr. Schroeder has
served the SSA as a consultative examiner since 1994, has served the Mansfield Probate
Court as a psychiatric evaluator since 1994, provides care to patients at a nursing home
in his local community, works as a staff psychiatrist at the Perception House residential
dual-diagnosis treatment program, and serves on the medical staffs of two other mental
health facilities, including Natchaug Hospital.  (Dkt. Entry No. 28-9.)

55.     According to a curriculum vitae submitted by plaintiff, Dr. Bono is on the
medical staffs at Albert Einstein Medical Center, Northeastern Hospital and Moss
Rehabilitation Hospital and served on three other hospital medical staffs before that.

(Dkt. Entry No. 28-10.)

56.     Dr. Schroeder and Dr. Bono have provided independent medical reviews for Anthem Life only in connection with appeals by claimants, not in connection with initial claims.  (Dkt. Entry No. 28-8 at p.4 of 5.)

57.     Dr. Schroeder provided independent medical reviews for Anthem Life in only 25 cases over the course of two years and nine months, and in 16% of those appeals, the initial denial was overturned in favor of the claimant.  (Dkt. Entry No. 28-8 at p.4 of 5.)

58.     Dr. Bono provided independent medical reviews for Anthem Life in only five cases over the course of a year and seven months, and the appeal involving plaintiff is the only one of those instances in which the initial denial was upheld in its entirety. (Dkt. Entry No. 28-8 at p.4 of 5.)

59.     Although he agreed that plaintiff was incapacitated by her Legionnaire's disease at the outset of her elimination period, Dr. Bono concluded that there was no objective medical evidence to support a finding of continuing disability beyond January 2008.  (AR 97-98.)  As Dr. Bono explained in his report:  "Chronic Legionellosis does not exist.  Legionellosis is an acute to subacute illness; none of the claimant's ongoing complaints may be attributed to legionellosis."  (AR 98.)

60.     Dr. Schroeder noted that Dr. Galpin's records, by and large, did not include any evidence to corroborate plaintiff's own complaints of depression or memory dysfunction, such as "corroborating observations or test results . . . .  such as detailed mental status examinations or psychological or neuropsychological testing with validity scales." (which, perhaps, is not surprising, given that Dr. Galpin is an infectious disease specialist and not a mental health professional).  (AR 103.)  Dr. Schroeder further noted that while Dr. Metzger's notes from September 2008 stated that plaintiff was "doing poorly and depressed," this was merely a description of plaintiff's self-report, and there were no "objective medical findings" to support it (which, again, is probably unsurprising, given that Dr. Metzger is a rheumatologist).  (AR 103; see also AR 177k.)

1    Dr. Schroeder, however, did observe objective medical assessments by Dr. Fitch,

2    plaintiff's psychologist, reflecting mental impairment around the time when she was

3    first seen by him on May 1, 2008, and for some time thereafter.  (AR 104.)  Finally, Dr.

4    Schroeder observed that the records from plaintiff's November 6, 2008 visit with Dr.

5    Levine, a neurologist, strongly contradicted any suggestion of notable mental

6    impairment, and Dr. Schroeder explained that he confirmed plaintiff's "significant

7    improvement" in this area with Dr. Fitch, who also informed Dr. Schroeder that

8    plaintiff's mental condition, standing alone, probably would not prevent her from

9    working.  (AR 103, 104; see also AR 151-58.)  Ultimately, Dr. Schroeder concluded

10   that there was sufficient objective medical evidence in the record to support a finding of

11   psychiatric disability from the time when plaintiff began seeing Dr. Fitch.[2]

12   _____

13       [2]  Specifically, Dr. Schroeder found "this impairment consisted of difficulty in

14   sustaining attention and concentration, and engaging in detailed work and in significant

15   learning and processing of information; and difficulty performing more stressful work tasks

16   such as working under deadlines or quotas, planning tasks, or multitasking.  The record did

17   not contain a detailed description of the employee's job duties as an Auditor, so this

18   reviewer cannot comment on whether these restrictions/limitations would preclude the

19   employee from performing her own occupation.  The limited information in the medical

20   record did not, however, show that this impairment was so severe as to preclude the

21   employee from performing simpler, routine and repetitive work duties during this time

22   frame.

The record as of 11/06/2008 noted improvement in the employee's cognitive and
psychiatric condition.  Dr. Fitch opined in the teleconference and that the employee's
psychiatric condition would not in itself to prevent her from working at this time.  (AR
105.)

* * * *

Assessment/Rationale:

This reviewer concluded that the limited objective medical evidence in the claim file
(described above) did adequately support the presence of psychiatric impairment from on
or about 05/08/2008 (when the employee first saw psychotherapist Dr. Fitch) until on or
about 11/06/2008 (when neurologist Dr. Levine noted an intact mental status examination.)
This information is consistent with the report of Dr. Fitch, who stated in the teleconference

(continued...)

61.     Woods reviewed the reports from Dr. Bono and Dr. Schroeder and prepared an "appeal summary and recommendation" on April 23, 2009.  (AR 83-85.) The recommendation was to deny the appeal, and the summary briefly explained the basis for her conclusion.  (AR 83-85.)

62.     Later that day, Woods faxed the reports to Kelly Tillotson at CDS and asked Tillotson if she would be available to discuss the reports on April 24, 2009.  (AR 94-106.)

63.     On April 27, 2009, Collins faxed a letter to Woods asserting that if the medical reviews of the RRS doctors were adverse to plaintiff's position on appeal, then she should be given an opportunity to rebut those findings "before proceeding to litigation" and suggesting that Collins had informed Woods of her position in this regard during a telephonic discussion earlier that day.  (AR 93.)

64.     On April 28, 2009, CDS provided Woods with a draft of a denial letter to plaintiff formalizing the decision prepared by Woods on April 23, 2009.  (AR 86-92.)

65.     On April 29, 2009, M. Catherine Pruitt (a higher-level manager at Anthem Life) approved the initial summary and recommendation prepared by Woods on April 23, 2009.  (AR 83-85.)

66.     Anthem Life sent plaintiff a letter officially denying her LTD appeal on April 29, 2009.  (AR 73-82.)  The final letter used the format of CDS's draft.  (AR 73-82.)  The letter relied on the conclusions of Dr. Bono and Dr. Schroeder that there was no objective medical evidence to support a claim of disability, at least during the

---

[2](...continued)
that the employee's psychiatric condition had improved significantly over the last four to five months.  The reviewer concluded that this psychiatric impairment consisted of difficulty performing more sustained and higher-level cognitive tasks, but would not have precluded the employee from performing simpler, routine and repetitive work duties.  The reviewer concluded that the recent mental health treatment has been optimal, and that the employee has reached maximum medical improvement, as Dr. Fitch opined that the employee's psychiatric condition would not in itself preclude her from working at this time."  (AR 106.)

pertinent time (as noted above and explained in the denial letter, Dr. Schroeder concluded that plaintiff may have been disabled by her psychiatric condition "for a closed period of time following the elimination period").  (AR 75-79.)  Anthem Life also responded to plaintiff's arguments regarding the alleged inconsistency between its decision and those of the SSA and the STD Plan, explaining that neither of those decisions was binding, noting that the other decision makers did not have the benefit of the independent medical reviews Anthem Life had commissioned, and observing that the rules governing claims to the SSA are not the same as those governing claims to the Plan.  (AR 76, 78.)

67.    Anthem Life also sent plaintiff a separate letter on April 29, 2009, denying her claim for waiver of premium under the Life Program.  (AR 80-82.)  Although it contains a shorter discussion of the issues, that letter, like the LTD letter, relies heavily on the conclusions of Dr. Bono and Dr. Schroeder in determining that plaintiff was not disabled during the pertinent period.  (AR 80-82.)

## VII.    The Reasonableness of Anthem Life's Decision.

68.    The Court finds that Anthem Life's decision on plaintiff's claim for LTD benefits was unreasonable based on the evidence presented during the administrative claim and appeal process. First, even though plaintiff first saw Dr. Fitch on May 1, 2008, that does not mean plaintiff was not disabled from performing the duties of an auditor earlier.  The concession by Dr. Schroeder that the evidence in the record supports a finding of psychiatric disability from the time she commenced seeing Dr. Fitch at least through November 2008, strongly suggests that she was disabled at an earlier date.  Dr. Galpin's reports, stating that plaintiff was suffering from depression associated with her recovery from Legionnaire's disease and was unable to return to work are totally consistent with Dr. Fitch's diagnosis, and Dr. Galpin at no time released plaintiff to return to work.  Moreover, contrary to defendants' suggestion, Dr. Dudley's earlier medical records, which show that plaintiff could work notwithstanding a variety of ailments, suggest that the onset of plaintiff's depression and inability to

work as an auditor occurred in connection with and as a consequence of her Legionnaire's disease.  Moreover, while not dispositive, the fact that plaintiff was approved for disability benefits by SSA in or about October 2008 is a factor, when considered with the statements of Drs. Galpin, Fitch and Schroeder, which suggests that denial of LTD benefits without further inquiry was inappropriate.

## CONCLUSIONS OF LAW

**I.     The Court Reviews Anthem Life's Decision for Abuse of Discretion.**

1.     Plaintiff asserts that she is entitled to de novo review because the LTD Plan gives discretionary authority to determine benefits to Anthem Life Insurance Company, and instead, the decision to deny plaintiff benefits was made by Wellpoint, the parent corporation of Anthem Life Insurance Company, acting in concert with totally unrelated entity, Custom Disability Solutions.

2.     Defendants respond that plaintiff has waived any claim that de novo review applies in this case because plaintiff stated in the Rule 26 report that it appeared that "judicial review shall be for abuse of discretion," and although plaintiff reserved the right to bring a motion regarding the standard of review, she failed to do so.  Opp. At 6.  Defendant alternatively argue that even if plaintiff did not waive her right to argue that de novo review applies, the fact remains that the decision to deny LTD benefits was made by Kristie Woods, with the approval of her manager Catherine Pruitt, both employees of Anthem Life Insurance Company.  (AR 73-85.)

3.     Because the Plan gives Anthem Life discretion to interpret the Plan and evaluate the facts when making claims decisions, the Court reviews Anthem Life's decision to deny plaintiff's claim for benefits only for an abuse of discretion.  See Metropolitan Life v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 2348, 2350 (2008) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 115, 109 S. Ct. 148 (1989)). This is a deferential standard of review.  See Glenn, 128 S. Ct. at 2348 ("Where the plan . . . grant[s] 'the administrator . . . discretionary authority to determine eligibility for

benefits . . . [t]rust principles make a deferential standard of review appropriate.'") (emphasis in original) (quoting <u>Firestone</u>, 489 U.S. at 111, 115).

4.     In any event, plaintiff has not established that the Plan Administrator forfeited its discretion via improper delegation of authority.  The Plan itself states that the duties, responsibilities and powers of the Plan Administrator (Anthem Insurance Companies, Inc.) have been delegated to Anthem Life for purposes of administering claims under the LTD Program and the Life Program.  First, the Plan defines the term "Plan Administrator" as "Anthem Insurance Companies, Inc. or its designated appointee which shall have those duties, responsibilities, and powers set forth in Article 6 of the Plan." (AR 452, emphasis added.)  Then, Article 6 states that Exhibit B to the Plan identifies the various "Benefit Program Plan Administrators"-i.e., the "designated appointees" referenced in the Plan's definition of the term "Plan Administrator." (AR 452, 463.)  Finally, Exhibit B identifies Anthem Life as the entity that exercises the plan administrator's authority with respect to claims under both the LTD Program and the Life Program.  (AR 479.)

5.     Nor did Anthem Life lose this discretionary authority merely because it consulted with CDS about plaintiff's claim and appeal.  The administrative record reflects that individuals working for CDS offered their opinions and other assistance to Anthem Life during the decision-making process (just as did various doctors associated BMI and RRS), but there is no evidence in the administrative record that CDS, rather than Anthem Life, made the decision to deny plaintiff's claim for benefits.  To the contrary, the record reflects that the decision was made by Anthem Life's Kristie Woods, with the approval of her manager, M. Catherine Pruitt.  (AR 73-85.)

6.     Similarly, the mere fact that the individuals involved in the claim and appeal process for Anthem Life use a "wellpoint.com" e-mail address or sometimes use letterhead or fax cover sheets containing the WellPoint logo (facts reflected in the administrative record) does not mean that WellPoint, Inc. (Anthem Life's parent company, see Dkt. Entry No. 7) made the decision to deny plaintiff's claim.

7.      On the other hand, Anthem's status as both the underwriter of the Policy and the claims administrator gives rise to a structural conflict of interest, which affects the applicable standard of review.  Mitchell v. Metro. Life Ins. Co., 523 F. Supp. 2d 1132, 1143 (C.D. Cal. 2007) (entity that was both the claims administrator and the insurer had an inherent conflict of interest); cf. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (9th Cir. 2006) (en banc) ("an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest.").

8.      Where, as here, a person's claim to ERISA plan benefits has been denied by an administrator which (1) has been conferred discretion under the terms of the plan and which (2) has a conflict of interest, the applicable standard of review is that set forth in Abatie.  See Saffon v. Wells Fargo & Co. Long Term Disability, 522 F.3d 863 (9th Cir. 2008) (treating claims administrators in the same manner as plan administrators for the purposes of Abatie).  In Abatie, the court held that, in these circumstances, a court must review the administrator's determination for abuse of discretion, but that this review is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." Id. at 968.  This standard, the court stated, "applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict." Id.

The court advocated a case-by-case approach to weighing an administrator's conflict of interest as part of its abuse of discretion analysis. Id. "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage.  An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might." Id. The court elaborated,

[t]he level of skepticism with which a court views a conflicted

administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

. . .

courts are familiar with the process of weighing a conflict of interest. For example, in a bench trial the court must decide how much weight to give to a witness' testimony in the face of some evidence of bias. What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records.[3]

Id. at 968-69 (citations omitted).

Here, the Court finds that a structural conflict existed in connection with the decision on appeal to affirm the denial of LTD benefits. Anthem's own expert, Dr. Schroeder, conceded that plaintiff was psychiatrically disabled from May 1, 2008, until

---

[3] Abatie also set forth rules regarding what materials a court may consider in conducting the foregoing analysis. The court noted the prevailing rule in the Ninth Circuit and elsewhere that, under an abuse of discretion standard of review, a court is limited to considering the materials before the plan administrator. Id. at 970; see Jebian v. Hewlett-Packard Co. Emple. Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1110 (9th Cir. 2003). It adopted a different rule for those circumstances in which a court must determine what weight to accord a plan administrator's conflict of interest. In such cases,

[t]he district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.

Id. at 970.

November 6, 2008.  For Anthem to state that any long term disability could not be found prior to May 1, 2008, is disingenuous, particularly in light of Dr. Galpin's repeated reports that plaintiff was unable to return to work, and the disability determination by SSA.  To assert that the disability arose only when plaintiff first saw Dr. Fitch, without further investigation, shows the exact sort of self-interested decision-making that <u>Abatie</u> addresses.  Accordingly, the Court concludes that the decision to deny LTD benefits on the record before it constitutes and abuse of discretion.  On the other hand, because no evidence suggests that plaintiff was totally disabled from any occupation, the Court concludes that plaintiff is not eligible for "waiver of premium" under the Life Plan.

**III.   <u>Plaintiff's Post-Lawsuit Letters From Her Doctors Are Inadmissible</u>**.

9.   Plaintiff has submitted to the Court three letters signed by her doctors in September, October and November 2009 (months after her administrative appeal was decided by Anthem Life and after this lawsuit was commenced) in an effort to demonstrate that plaintiff is disabled.  The Court concludes that these letters are irrelevant and inadmissible.

10.   As an initial matter, plaintiff's health in the fall of 2009 is irrelevant.  The question presented to Anthem Life (and the decision on review here) is whether plaintiff was disabled throughout and at the end of her elimination period from September 2007-March 2008.  To be sure, if plaintiff had been found disabled for the duration of that elimination period, then her continuing status would be important because she could not have continued receiving benefits without remaining disabled, but that is not what happened here.

11.   In any event, these letters were not before Anthem Life during the administrative process, and the Court's role is to review Anthem Life's decision based on the administrative record, not based on additional evidence created well over a year after her claim for benefits was made and produced to counsel for Anthem Life months after her administrative appeal was denied and this lawsuit had commenced.  <u>See Burke</u>

v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1027-28 (9th Cir. 2008) ("It is the general rule, of course, that when applying an abuse of discretion standard to an ERISA plan, the district court's review is limited to the administrative record.") (noting exceptions not here applicable).

12.     Plaintiff argues that "extrinsic evidence" is properly considered where the plan administrator has "precluded 'the full development of the administrative record,'" (Pl. Trial Brief at 20, quoting Burke, 544 F.3d at 1028), but in Burke, the Ninth Circuit observed that the plan administrator had articulated a new basis for denying the plaintiff's claim on appeal that was not mentioned during the initial claim process-namely, the timeliness of her claim-and had given the plaintiff no indication that it was considering that issue on appeal, so she had no opportunity to provide her position on the issue, see id.  Accordingly, the court held that the plaintiff should be allowed to submit evidence to the district court on that issue.

13.     Plaintiff also cites Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 873 n.4 (9th Cir. 2008), for the proposition that the Court should consider her post-lawsuit doctors' letters because the administrative record was closed even though her doctors never returned Dr. Bono's telephone calls.  (See Pl. Trial Brief at 16, 20.)  In Saffon, the plaintiff had been approved for LTD benefits and received them for a year, at which point the plan administrator determined that she was no longer disabled based on an independent doctor's review of her medical records.  See 552 F.3d at 866.  Before making this decision, the plan administrator gave claimant's doctor ten days to notify it of any disagreement with the independent doctor's conclusions (without notifying the claimant); the doctor did not reply, and benefits were terminated.  See id. at 869.  Plaintiff appealed, and during the appeal process submitted a letter from her doctor rebutting the independent doctor's earlier conclusions.  See id.  The Ninth Circuit did not say that this course of events allowed the plaintiff to submit evidence outside the administrative record; rather, it suggested that the plan administrator's failure to notify the claimant of its inability to reach her doctor under these circumstances-along with

numerous other factors-should be considered by the district court in determining how to weigh the structural conflict present in that case.  See id. at 873, 873 n.4.

14.    In sum, plaintiff has not cited any legal authority supporting her attempt to supplement the administrative record with post-lawsuit letters from her doctors, and the Court concludes that these letters are both irrelevant and inadmissible.

**IV.**    **Plaintiff Is Not Entitled To Statutory Penalties**.

15.    Plaintiff bears the burden of proof on her claim for penalties under Section 502(c)(1) of ERISA, 29 U.S.C. § 1132(c)(1).  In particular, she must prove:  (I) that she requested the document in question from the Plan Administrator in writing and (ii) that the Plan Administrator failed to provide it.  See Kerr v. Charles F. Vatterott & Co., 184 F.3d 938, 947 (8th Cir. 1999).

16.    In this case, plaintiff has not submitted any admissible evidence to show that the Plan Administrator failed to provide her with the plan document she requested. She has submitted only a declaration from her counsel to that effect.  Whereas a declaration could be offered in support of a motion for summary judgment on this issue, plaintiff did not file such a motion.  Consequently, if plaintiff wished to establish the facts necessary to her claim for penalties, then her counsel would have needed to testify at trial.  See FED. R. EVID. 801(c), 802.  Although, as noted above, the ordinary rules of evidence are somewhat relaxed in certain respects in claims for benefits under Section 502(a)(1)(B) of ERISA, the Federal Rules of Evidence apply as usual to a claim for monetary penalties under Section 502(c)(1).

17.    In any case, even accepting plaintiff's view of the facts without admissible evidence, she was able to prepare an appeal without the document she requested, (see AR 120-22), she was provided with the requested document before the appeal was decided, (see AR 767-817), and she offered no new arguments after being provided with the document.  Under these circumstances, plaintiff suffered no harm.  There is also no evidence of intentional malfeasance by Anthem Life.

18.    For all these reasons, the Court does not award plaintiff any statutory

penalties under Section 502(c)(1) of ERISA.

## CONCLUSION

For all the foregoing reasons, the Court finds that plaintiff is entitled to twenty-four months of LTD benefits.  The Court otherwise denies plaintiff's request.  The amount of plaintiff's costs and reasonable attorney's fees shall be determined by motion to the Court to be filed within thirty days of entry of judgment herein, rather than the fourteen day period prescribed by statute, so as to allow the parties opportunity to discuss a voluntary resolution of this case, as well as plaintiff's fees and costs.

Dated: August 9, 2010

_Christina A. Snyder_
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE